UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBERT TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00854-JMS-MPB |
| | ) | |
| ADAM DUNCAN, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, RESOLVING PENDING MOTIONS, AND ORDERING PLAINTIFF TO SHOW CAUSE WHY SUMMARY JUDGMENT SHOULD NOT BE ENTERED ON OTHER GROUNDS**

In 2019, Adam Duncan and Steve Swinehart were responsible for supervising Robert Taylor's compliance with his parole conditions. This action is based on Mr. Taylor's allegations that he complained about their efforts to enforce certain conditions and that they retaliated against him for conduct protected by the First Amendment.

The material facts are undisputed and show that the defendants are entitled to judgment as a matter of law—albeit on grounds not raised by the defendants. In this entry, the Court denies the defendants' motions for summary judgment, resolves the remaining motions pending on the docket, and orders Mr. Taylor to show cause why summary judgment should not be granted on alternative grounds.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the

record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is

not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 572–73 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. Facts

In 2012, Mr. Taylor was sentenced to 17 years in prison for one count of rape. He was paroled in November 2019. Dkt. 65-2 at 88–92.

**A.     Mr. Taylor's Parole Conditions**

Mr. Taylor was subjected to standard restrictions for parolees. Dkt. 65-2 at 92. Indiana Department of Correction (IDOC) officials were authorized to visit his residence or place of employment at any reasonable time. *Id.* at ¶ 9(a). Moreover, IDOC officials were authorized to search his residence if they had reasonable cause to believe he was violating a parole condition. *Id.* at ¶ 9(b).

Mr. Taylor was subjected to additional restrictions because he was classified as a sex offender. *Id.* at 88–91. Most notably, he was obligated to "participate and complete periodic polygraph testing at the direction of [his] parole agent or any other behavioral management professionals." *Id.* at 90, ¶ 24.

**B.     The Defendants**

Mr. Swinehart was a district coordinator for Liberty Behavioral Health, which contracted with the IDOC "to manage and run the Indiana Sex Offender Monitoring and Management Program ('INSOMM') and other programs for sex offenders." Dkt. 65-1 at ¶ 2. He was specifically responsible for "helping parolees participating in the INSOMM program, or other sex offender programs, comply with the requirements of that program by facilitating and scheduling required

appointments and working with parole agents employed by the State to ensure compliance." *Id.* When Mr. Taylor was paroled in November 2018, Mr. Swinehart was a member of his "Containment Team," which also consisted of a parole agent and a behavioral therapist. *Id.* at ¶ 9.

Mr. Duncan was a senior parole agent for the IDOC. Dkt. 70-1 at ¶ 2. His responsibilities included offender risk assessments, community-based clemency and parole investigations, drug screenings, providing resources to aid parolees in their rehabilitation, monitoring parolees' compliance with parole conditions, and apprehending parolees who violated parole conditions. *Id.* at ¶ 4. Mr. Duncan did not become involved in Mr. Taylor's case until July 2019. *Id.* at ¶ 5.

C. **Conflict Over Polygraph Examinations**

Much of this case arises from a dispute over Mr. Taylor's polygraph testing requirement, his resistance to that requirement, and the defendants' efforts to enforce that requirement.

Mr. Taylor's first polygraph was scheduled for May 2019. In February, he raised concerns about taking a polygraph due to a long-term heart condition. Dkt. 65-3 at 3. Mr. Swinehart communicated that he would need to "get a letter stating that testing would be detrimental to his health." *Id.*

In late February, Mr. Taylor asked Dr. John Sidle whether he should sit for a polygraph exam given his heart condition and treatments. Dkt. 65-4 at 21:3–22:9. After reading articles and scientific information about polygraph testing, Dr. Sidle wrote a letter on Mr. Taylor's behalf, stating:

> Mr. Taylor suffers from coronary artery disease and severe heart failure. He has a pacemaker/ICD device. He also is on multiple medications that control his blood pressure and are keeping his heart rate suppressed. His medications and health status will make a lie detector test very inaccurate, so I do not recommend it.

Dkt. 65-5 at 2; *see also* dkt. 65-4 at 13:8–15:3, 22:10–23:18.

4

Mr. Taylor gave a copy of Dr. Sidle's letter to his parole agent, who forwarded it to Mr. Swinehart. Dkt. 65-3 at 6. After consulting with polygrapher Mike Turk, Mr. Swinehart determined that Mr. Taylor should still report for his polygraph on May 7. *Id.* at 5–6.

But Mr. Taylor did not appear. Mr. Turk notified Mr. Swinehart, who determined that Mr. Taylor would be scheduled for another polygraph, this time at a higher cost. *Id.* at 10; dkt. 65-2 at 33–35.

In late May, Dr. Sidle prepared a second letter for Mr. Taylor. It was identical to the first, except it concluded:

> His medications and health status will make a lie detector test very inaccurate. NO.
> He should NOT be given a lie detector test.

Dkt. 65-5 at 1. After learning of that letter, Mr. Swinehart again consulted with Mr. Turk by e-mail. Mr. Swinehart described Mr. Taylor as "a denier who has been trying to get out of going to treatment and anything else he can," and he recommended that Mr. Taylor still be subjected to the test. Dkt. 65-3 at 37. Mr. Turk stated he was concerned based on Mr. Taylor's actions thus far and Dr. Sidle's letter that examining Mr. Taylor would precipitate a lawsuit. *Id.*

Mr. Taylor reported for his rescheduled polygraph exam on June 19, 2019. *Id.* at 23. He showed Dr. Sidle's second letter to Mr. Turk. *Id.* Nothing in the record indicates that Mr. Taylor refused to sit for the polygraph exam, but he did refuse to sign consent forms and liability waivers. *Id.* At that point, Mr. Turk declined to administer the test. *Id.*

On June 29, 2019, Mr. Swinehart e-mailed another polygrapher to arrange another test. Dkt. 65-3 at 29. Mr. Duncan joined Mr. Taylor's control team in July. On July 15, Mr. Swinehart sent Mr. Duncan an e-mail summarizing Mr. Taylor's resistance to taking a polygraph exam and stating, "I would suggest telling Robert Taylor to come in this Thursday so we can give him the appointment letter and explain again this is a maintenance polygraph, not one that has anything to

5

do with his offense." *Id.* at 31. Mr. Duncan notified Mr. Taylor of his rescheduled polygraph appointment on July 18. *See* dkt. 65-2 at 42–43.

Mr. Taylor reported for his rescheduled polygraph exam on September 16, 2019. Dkt. 65-3 at 34. He presented Dr. Sidle's letter to the polygrapher, who declined to administer the test. *Id.*

Mr. Duncan met with Mr. Taylor and Mr. Swinehart on September 19, 2019, and announced that his curfew would begin at 5:00 P.M. instead of 9:00 P.M. until he submitted to a polygraph exam or provided a doctor's letter stating that a polygraph would endanger his health and not simply carry a risk of inaccuracy. Dkt. 65-2 at 50. During this meeting, Mr. Duncan and Mr. Swinehart became angry and profane, and Mr. Taylor told them he would be speaking to an attorney and filing a complaint. *See* dkt. 65-6 at 27:20–28:10, 75:9–76:11, 99:23–100:3.

**D.     Home Search and Parole Revocation**

Mr. Duncan visited Mr. Taylor's home on September 30, 2019, with six other parole agents and a correctional police officer. Dkt. 65-2 at 77. This was not Mr. Mr. Taylor's first home visit; in fact, parole agents visited Mr. Taylor's residence at least thirteen times before the September 30 visit. *See id.* at 8, 19, 21, 27, 29, 30, 32, 34, 38, 40, 45, 48, 50. This time, officers found evidence of numerous parole violations, including a shotgun and ammunition in the kitchen, children's clothing throughout the home, and a woman in Mr. Taylor's bedroom. *Id.* at 75–79. Mr. Duncan documented these violations and recommended that a warrant be issued to arrest Mr. Taylor. *Id.* at 75–76.

On October 8, 2019, an initial hearing panel found probable cause to believe that Mr. Taylor violated his parole conditions and recommended that he be returned to prison to await a final revocation hearing. *Id.* at 70–73. The parole board held its hearing on November 15, 2019,

found Mr. Taylor guilty of violating his parole conditions, and ruled that he must serve the remainder of his prison term. *Id.* at 63–66.

**E.     Section 1983 Suit**

Mr. Taylor brought this action under 42 U.S.C. § 1983 in March 2020. In his amended complaint, dkt. 6, Mr. Taylor alleged that Mr. Swinehart and Mr. Duncan moved up his curfew and initiated the search of his residence for two reasons: he did not submit to a polygraph, and he "filed a complaint against" Mr. Duncan and Mr. Swinehart in September 2019. Dkt. 6 at ¶ 50.

When the Court screened Mr. Taylor's amended complaint in April 2020, it identified plausible First Amendment retaliation claims against both defendants. Dkt. 10 at 3. Mr. Taylor was given through May 29 to notify the Court if he believed he raised additional claims in the amended complaint, *see id.* at 5, and he never did. Likewise, Mr. Taylor never moved to amend his complaint to add new claims.

The form and contents of the "complaint" Mr. Taylor filed in September 2019 are a mystery. Mr. Taylor testified in his deposition that he "mailed it in" and that his own copy was confiscated during the search of his house. Dkt. 65-6 at 31:3–10. Mr. Swinehart and Mr. Duncan both deny receiving or learning of any complaint filed in September 2019. Dkt. 65-1 at ¶ 36 (Swinehart decl.); dkt. 70-1 at ¶¶ 40–41 (Duncan decl.); Dkt. 70-3 at § 24 (Duncan interrogatory responses). Mr. Taylor requested a copy of the complaint in discovery, but Mr. Duncan responded with a copy of Mr. Taylor's amended complaint in this action instead. *See* dkt. 65-7.

Throughout his summary judgment brief, Mr. Taylor refers to filing a "state court action." *See* dkt. 80. However, a search for civil actions filed in Indiana's state courts in 2019 returns no results involving these parties. *See* Case Search, https://public.courts.in.gov/mycase/#/vw/Search (last used Jan. 26, 2022).

7

In his deposition, Mr. Taylor offered varying descriptions of how he submitted his complaint, including that he:

- told the defendants during the September 19 meeting that he "filed a complaint on them," dkt. 65-6 at 26:16–23;

- told them he "was goin' to file it," *id.* at 26:24–27:3;

- told them, "look, I'm filin' this complaint" and "that I'm contacting my attorney," *id.* at 29:14–17;

- told them, "I'm getting ready to call my lawyer, and I'm getting ready to file a complaint," *id.* at 75:9–17;

- told them, "I'm gettin' ready to get my lawyer and I'm going to file a complaint on your ass," *id.* at 76:5–7;

- "set it up with [his] lawyer, and [] filed a complaint on him, and [] mailed it in to him," *id.* at 100:21–22; and

- spoke to his lawyer, who called Mr. Duncan after Mr. Taylor left the office, *id.* at 75:9–25.

Despite extensive discussion of the complaint, Mr. Taylor did not describe its contents in his summary judgment affidavit or deposition, despite being given numerous opportunities to do so:

> Q    What I'm trying to say is we don't have a copy of that complaint. And so if you don't have a copy of it either, can you please tell us on the record what it stated?
>
> A    I don't recall.
>
> Q    You don't recall?
>
> A    Excuse me?
>
> Q    You don't recall what the complaint said?
>
> A    Excuse me?
>
> Q    You don't recall what the complaint said?
>
> A    It's in line—what I said in my complaint is in line with what I said up in here. But specifically, no, I don't recall exactly what was said in there. All I know is I put it in the mailbox, and I mailed it to DQ3, and I sent one to the court.

Dkt. 65-6 at 137:17–138:7.

## III. Analysis

Much of the record concerns matters not at issue in this lawsuit—namely, the validity of Mr. Taylor's parole conditions, whether he was entitled to resist a polygraph exam, and whether he violated those conditions. Disputes on these issues are immaterial because the only claims pending are First Amendment retaliation claims.

A retaliation claim consists of three elements: (1) that the plaintiff "engaged in protected First Amendment activity"; (2) that "an adverse action was taken against him"; and (3) that "his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020). Mr. Taylor's claim falls short in several respects. The defendants are not entitled to summary judgment on the grounds they asserted, but the undisputed facts nevertheless show that Mr. Taylor's claims fail as a matter of law.

### A.    Grounds Raised by the Defendants

The arguments the defendants have raised in their motion do not entitle them to summary judgment. Both defendants dispute ever receiving or learning of Mr. Taylor's complaint, but he has testified otherwise, and his testimony is entitled to deference at summary judgment. *See* dkt. 65-6 at 29:18–23 ("I know he got the complaint, I know they got the complaint because . . . they got it, because Duncan said that they got it . . . ."). Mr. Swinehart denies personal responsibility for or

involvement in the decisions to change Mr. Taylor's curfew or instigate a home search, but Mr. Taylor's testimony again creates a factual dispute. *See* dkt. 65-6 at 29:3–17.[1]

Agent Duncan asserts the defense of qualified immunity, but he relies on the factual assertion that he "has no personal animus towards Plaintiff and acted in good faith at all times." Dkt. 70 at 19. Mr. Taylor's deposition similarly calls this assertion into dispute.[2]

The defendants also argue that the actions of which Mr. Taylor complains—curfew modification and home search—were lawful actions given the terms of his parole. But "an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (cleaned up). And the defendants' motions do not adequately confront the question of whether Mr. Taylor's September 2019 complaint—assuming he presented it— motivated a retaliatory curfew modification and home search. Accordingly, the Court cannot grant the defendants' motions as presented.

---

[1] Q   Did you hear Steve say change his curfew?

A   Yes, I did.· That's why the parole officer, Ms. Dyson (Phonetic), she was sittin' on the other side of the room, she heard it, and she said change it to 3:00.

Q   Okay. And then the search that happened, why do you believe that Steve was involved in that search?

A   Because he was standin' right there, and he told—because he—like I said at the beginning, that he was tellin' Duncan to do all these things. When I told them, look, I'm filin' this complaint, which I did, and I told them that I'm contacting my attorney, that same day my attorney called him and Duncan.

[2] *See, e.g.*, dkt. 65-6 at 52:2–10 ("Duncan come—Duncan com all crazy, he tellin' me—he came right in, threatenin' me about this lie detector test; if you don't take this test, I'm going to get a warrant . . . . I'm going to get a warrant from the judge and send you back—have your ass sent back to prison."), 100:10–15 ("He cussed me out because he—he seen—he said—because he told me not to show that goddamn exempt letter to the motherfuckin' polygrapher again. He told me to go in there and just take the test and don't show the polygrapher shit.").

### B. Alternative Grounds for Summary Judgment

Still, viewed through the proper legal framework, the undisputed evidence entitles the defendants to judgment as a matter of law. There is no evidence demonstrating that the "complaint" underlying Mr. Taylor's claims fell under the First Amendment's protections. And, even if it did, the defendants did not violate Mr. Taylor's First Amendment rights by modifying his curfew before receiving the complaint or executing a home visit, which was inevitable.

#### 1. First Amendment Activity

If Mr. Taylor presented a "complaint" in September 2019, the record is devoid of any information about what it said or to whom it was presented. Accordingly, a jury could not reasonably deem Mr. Taylor's complaint a protected First Amendment activity.[3]

"The First Amendment provides broad protection to speech, but not all speech." *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992) (identifying categories of expressive conduct excluded from First Amendment protection). For example, "[g]rievances addressed to a government agency are, if intelligible, nonfrivolous, and nonmalicious, petitions for the redress of grievances within the meaning of the First Amendment and are therefore prima facie protected by the amendment." *Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016). By contrast, "it seems implausible that a *threat* to file a grievance would constitute a First Amendment-protected grievance." *Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009).

---

[3] The September 2019 complaint is the only expressive activity the Court considers in evaluating Mr. Taylor's retaliation claim. Whether Mr. Taylor was properly subjected to the polygraph requirement, and whether it was permissible for him to object to it based on his medical condition, bear on the propriety of his parole conditions. As the Court noted in screening the amended complaint, the doctrine of *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), bars the Court from considering these issues. *See* dkt. 10 at 4; *see also Williams v. Wisconsin*, 336 F.3d 5376, 579–80 (7th Cir. 2003) (Challenges to lawfulness of parole conditions are challenges to the fact of a parolee's custody and must be raised through a petition for a writ of habeas corpus.).

By testifying that he sent a complaint in the mail, or informed the defendants that he sent a complaint, or had his attorney make a phone call, perhaps Mr. Taylor has raised a good faith dispute as to whether he engaged in expressive conduct. But he has provided no evidence of the contents of his complaint, despite asked point blank to describe it in his deposition. *See* dkt. 65-6 at 137:17–138:7.

Did Mr. Taylor actually send a written grievance to a government agency, or did he merely threaten to do so? Were his communications intelligible and nonfrivolous, or were they malicious? Nothing in the record would aid a juror in answering those questions at all—much less in Mr. Taylor's favor. A reasonable jury could not make an evidence-based finding that Mr. Taylor engaged in conduct protected by the First Amendment.

**2. Causation**

Assuming, for argument's sake, that Mr. Taylor submitted a complaint protected by the First Amendment, there is no evidence that it motivated an adverse action. He asserts two adverse actions: moving the start of his curfew from 9:00 to 5:00 P.M., and the September 30 home search. But Mr. Taylor's complaint could not have caused either based on the evidence in the record.

There is no dispute that the defendants communicated the change in Mr. Taylor's curfew at the September 19 meeting as a consequence of his failure to take a polygraph test. Moreover, Mr. Taylor's deposition testimony makes clear that they communicated this action *before* he said he intended to submit a complaint—and certainly before he could leave the office and follow through on his threat:

> A   On the 19th of September, when they cussed me out and told—and he told him to change my curfew from 9:00 to 5:00 because I didn't take the polygraph test -- and I didn't refuse to take the test, I paid my money to go take it.
>
> [. . .]

12

> A    And thirdly, he—he sent Duncan out there, after me filin'—after I left that office, I told them that I filed a complaint on them, he—he—in that response—by they respondin' to that, they came and did an unannounced home compliance check on this man's house that I was renting a room from, when they came in there unannounced.
>
> [. . .]
>
> A    And the reason he tell me—and the reason, if I don't get it, you goin'—you goin' to change my curfew, and then you goin'—then you come and raid my house because you thought—he thought that I was playin' when I told him that I'm goin' to file a complaint on him, and I'm getting ready to contact my lawyer. See, he thought I was playin', but I was serious, and that's what I did.

Dkt. 65-6 at 26:6–23, 134:6–14.

If Mr. Taylor filed a complaint, it was not a motivating factor in the decision to modify his curfew. Indeed, the record shows that causation ran the opposite way: the defendants' decision to modify Mr. Taylor's curfew caused him to file a complaint.

Meanwhile, there is no dispute that home visits were a regular part of Mr. Taylor's parole. His parole conditions stipulated that parole agents could and would visit his home. Dkt. 65-2 at 92, ¶¶ 9(a)–(b). In fact, parole agents visited Mr. Taylor's residence at least thirteen times before the visit on September 30. *See* dkt. 65-2 at 8, 19, 21, 27, 29, 30, 32, 34, 38, 40, 45, 48, 50.

Mr. Taylor's parole conditions also called for a reasonable search of his residence if his parole agent had "reasonable cause to believe that the parolee is violating . . . a condition." Dkt. 65-2 at 92 at ¶ 9(a). Rightly or wrongly, one of Mr. Taylor's parole conditions required him to submit to periodic polygraph examinations. *See id.* at 90, ¶ 24. And the parole staff had reasonable cause to believe that Mr. Taylor violated that condition given that he did not complete any of the three tests arranged between May and September 2019.

"In the end, the plaintiff must demonstrate that, but for his protected speech, the [defendant] would not have taken the adverse action." *Graber v. Clarke*, 763 F.3d 888, 899 (7th Cir. 2014). If the plaintiff makes a *prima facie* showing that his protected activity was at least a motivating factor

13

behind the defendant's adverse action, "'the burden shifts to the defendant to show that the harm would have occurred anyway.'" *Hawkins v. Mitchell,* 756 F.3d 983, 996 n.10 (7th Cir. 2014) (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 251–52 (7th Cir. 2012) (cleaned up). "And if the defendant does this, 'the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus.'" *Id.* (quoting *Thayer*, 705 F.3d at 252).

The undisputed evidence makes clear that, if Mr. Taylor remained on probation, he would have been subjected to a home visit following his September 19 meeting with the defendants, whether or not he submitted the complaint he has described throughout this lawsuit. Given that his ongoing resistance to polygraph testing essentially produced a continuous parole violation, the record also indicates that a home search was inevitable. Meanwhile, Mr. Taylor has offered only speculation[4] and not evidence to demonstrate that his failure to take a polygraph was a pretextual basis for the home search. *See Soto v. Bertrand*, 328 F. App'x 331, 333 (7th Cir. 2009) ("[M]ere speculation is not sufficient to stave off summary judgment.") (citing *Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 544 F.3d 752, 757 (7th Cir. 2008)).

The record makes clear that, with or without any complaint, Mr. Taylor would have been subjected to a home search as a regular part of his parole. Because Mr. Taylor has not pointed to evidence that standard parole monitoring and enforcement were merely a pretext for the

---

[4] *See, e.g.*, dkt. 65-6 at 26:24–27:2 ("He didn't set no schedule for this compliance check or nothing. It was solely based on that complaint that I filed against him . . . ."), 30:7–9 ("There wasn't no other reason for them to come at me. The only reason they did that was because of that complaint . . . ."), 70:23–71:5 ("They didn't do no home compliance check before they allowed me to go in there. But yet you want to go—because you mad I filed a complaint, you want to go get mad and go do a—and just go do an unannounced compliance check, and everything you find in there, you charge me with, and send me back to prison. That ain't fair. That ain't right."), 126:1–7 ("[H]ow can you say that it was retaliatory for them to conduct what otherwise is already within their full authority to do?" "Because—I explained that to you. Because I filed a complaint against him, that's why he did that.").

14

September 30 search, a jury could not reasonably find that his complaint motivated the search, and the defendants are entitled to summary judgment.

### IV. Pending Motions

After summary judgment motions were fully briefed, Mr. Taylor moved for an extension of time to file an additional response to the defendants' motions. Dkt. 83. He then filed amended affidavits, memoranda, and statements of material facts that appear to be photocopies of the originals with additional citations. Dkts. 85, 86, 87, 90, 91.

Mr. Taylor's motion for extension of time, dkt. [83], is **denied as moot**. Mr. Taylor has now filed the documents he sought additional time to file. The defendants' motion to strike Mr. Taylor's amended summary judgment materials, dkt. [88], is also **denied as moot**. The amended filings are inconsequential, and the Court has not considered them in assessing the defendants' summary judgment motions.

### V. Conclusion and Order to Show Cause

The defendants' motions for summary judgment, dkts. [65] and [69], are **denied**. Mr. Taylor's motion for extension of time, dkt. [83], and the defendants' motion to strike, dkt. [88], are **denied as moot**.

Mr. Taylor will have **through February 28, 2022**, to **show cause** why the Court should not grant summary judgment in the defendants' favor for the reasons discussed in Part III. If he fails to respond in the time provided, the Court will grant the defendants summary judgment and enter final judgment without further warning or opportunity to show cause.

IT IS SO ORDERED.

Date: 1/28/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

ROBERT TAYLOR
112988
NEW CASTLE – CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

All electronically registered counsel.